## MARSTON *v.* MARSTON.

A gift of chattels accompanied by delivery will pass the property to the donee.

But the property will not pass unless the chattels be delivered.

Where the property in chattels passes by a gift accompanied by delivery, it cannot be reclaimed by the subsequent execution of a will by the donor bequeathing the property to another person.

Marston *v.* Marston.

A testator, being the father of an illegitimate child by his niece, delivered to his brother and executor certain promissory notes for the support of the child: *Held*, that this was a gift to the child of so much of the notes as was necessary for its support.

Where an executor holds property delivered to him by the testator for the purpose of supporting the testator's illegitimate child, he is a trustee for that special purpose, and should not be charged with the property in his account, until after the death of the child, when he should be allowed for the sums expended for its support, and a reasonable compensation for his services.

Where an executor, holding property of the testator in trust for a special purpose, appealed from the decree of the judge of probate relating to the fund, claiming no interest in the fund except as trustee, and the decree was affirmed in part, and reversed in part; and the questions were sufficiently important to authorize the appeal, it was *held*, that costs should be taxed for the executor.

APPEAL from a decree of the judge of probate for the county of Rockingham, wherein David C. Marston, executor of the will of Samuel P. Marston, is appellant, and Andrew B. Marston is appellee. The case was referred to an auditor, whose report stated the following facts:

Samuel P. Marston, on the 7th day of March, A. D. 1842, made his last will and testament, wherein he gave and devised to his niece, Abigail P. Marston, a daughter of his brother, Nathaniel Marston, and now the wife of Asa L. Marden, his farm on the Lafayette road, in Portsmouth, and all the stock and farming utensils appurtenant thereto; and all the rest of his property of every description he gave and devised to his niece, Mary P. Marston, another daughter of his brother Nathaniel, and now the wife of David C. Marston, and appointed the said David executor of his last will and testament.

Samuel P. Marston, in the latter part of March, 1842, went to Cuba in the West Indies, and died there in May, 1843. His will was duly approved and allowed at a probate court holden at Exeter on the 14th day of June, 1843, and the said David was appointed executor thereof, took upon himself that trust, and made and returned to the probate court an inventory and appraisement of the estate of the testator in common form, amounting to $9,856.71, which was sworn to by the executor on the 19th day of June, 1843. In the inventory the executor gave a sche-

Marston v. Marston.

dule of the notes belonging to the estate of the testator, and among others the following notes:

"Note, dated July 22, 1833, against William Weeks,
balance due, $2,123.00

Note, dated May 19, 1841, against William H. Weeks
and others, $425.00

Note against William Weeks, dated, balance due, $100.00"
All the other notes named in the schedule amounted to $204.42.

In April, 1844, an instrument was found purporting to be signed by Samuel P. Marston, attested by one witness, and bearing date the 26th day of March, 1842, wherein, for divers good causes and valuable considerations, he promised to pay his nephew, Andrew B. Marston, son of John P. Marston, the sum of $1500 with interest thereon, or to his order, two years after date, subject to his pleasure of revoking the same, and if not revoked to remain in full force. On the 14th day of May, 1844, Andrew presented to the judge of probate for the county of Rockingham, his petition in writing, praying that the instrument might be proved, approved, and allowed as a codicil to the last will and testament, and that the executor might be decreed to perform and execute the intentions of the testator as expressed in the codicil. The judge of probate, after hearing the parties, disallowed the instrument as a codicil to the will, and from the decree disallowing the same, Andrew B. Marston appealed to the Superior Court, where a hearing and trial were had in the due course of law, and the Superior Court reversed the decision of the judge of probate, and approved and allowed the instrument as a codicil to the will, to operate and take effect only as to his personal estate. Immediately after that decision was made, the executor petitioned the Superior Court for a new hearing or trial upon the probate of the instrument, which was considered by the Superior Court and refused, and the final decision in the case was made at the Superior Court, December term, 1847.

The executor, upon being cited thereto, on the second Tuesday of January, 1848, presented to the Probate Court for settlement, his account as executor of the will, and at a probate court holden

41 *

on the 9th day of May, 1848, the same was settled, and a balance found in the accountant's hands of $2,665.46. From the decree of the judge of probate upon the settlement of the account, the executor claimed this appeal to the Superior Court, and assigned the following reasons of appeal :

1. Because said David C. Marston was charged as executor as aforesaid, with about three thousand dollars collected of William Weeks and others, whereas he says that he was trustee of said three thousand dollars, and held said money, or the security therefor, for a specific trust, which has not yet been fulfilled or expired, and that said trust could not be, and was not revoked, or in anywise affected by the will or subsequent contract of said Samuel P. Marston.

2. Because said David C. Marston, as executor as aforesaid, was charged with, and decreed to have in his hands, as executor, three thousand dollars more than ever came into his hands as executor of said Samuel P. Marston's said will.

3. Because said David C. Marston holds, and is bound to apply and account for, said three thousand dollars, as trustee and not as executor as aforesaid.

4. Because interest has been charged against him on funds in his hands awaiting a determination of the question, to whom they belonged.

5. Because his disbursements and payments from said three thousand dollars for and on account of the trust upon which said money was deposited, has not been allowed.

6. Because he has not been allowed a fair and reasonable compensation for his services as trustee and executor.

Samuel P. Marston was never married ; he lived on his farm in Portsmouth, and had for his housekeepers, or, living with him, his two nieces before named, Mary P. Marston and Abigail P. Marden, daughters of his brother Nathaniel, who had ten children, five sons and five daughters. In October, 1840, Mary returned home to her father's, and gave birth to an illegitimate child a few days afterwards. Mary, when she came home, upon being questioned by her mother, said that she was pregnant, and that her uncle Samuel was the father of the child. These declarations

of Mary were objected to by the appellee, but were admitted by the auditor.

Nathaniel and his wife, Elizabeth, immediately after the birth of the child, sent for Samuel, who came to their house on the same day, and admitted that he was the father of the child, and expressed much regret for what had happened, and said that he would do all in his power to make reparation, and would always support the child, but he wanted the matter kept secret on account of the family and his own reputation; he requested Nathaniel to find a place for the child where it could be kept secret, and told him that he would pay for its support, and was willing to do any thing about the matter that he, Nathaniel, thought he ought to do, and upon being asked by Nathaniel what he was willing to do, said that he would give to the child the Weeks notes for the purpose of bringing it up.

Nathaniel employed Mrs. Leach, of Kittery, to take care of the child, and the child was carried there the day after its birth, and the matter was kept secret. Mary was married to David three or four weeks after the birth of the child, there having been no previous engagement or courtship between them to the knowledge of her parents. Samuel furnished Nathaniel with the money to pay for the support of the child, quarterly, and Nathaniel paid it quarterly to Mrs. Leach for about one year and a half. Samuel then concluded to go to Cuba, and told Nathaniel of it five or six weeks before he went, and said he was going to make his will and to give to Abigail his home place, and to Mary the place where he was born; and upon being inquired of, by Nathaniel, what he was going to do for the child, he said he had agreed with him that the Weeks notes should go to support and bring up the child, and if any thing was left it was to go to the child, and asked Nathaniel if that would satisfy him, and Nathaniel said it would. Samuel was at Nathaniel's house a few days before he left, and told him he had made his will, and had given to Abigail and Mary what he had intended for them, but had not made provision for the child in his will, as that might expose the matter; but he was going to put the Weeks notes into the hands of some one for the support of the child, his inten-

tion being, that the two girls and the child should have all his property. He proposed to put the notes into the hands of Edward Cutts, upon whom Nathaniel was to draw for the money to pay for the support of the child; but Nathaniel objected to Cutts, as that might lead to exposure, and proposed that he should put the notes into the hands of David, so that he could draw upon him for the money, to which Samuel assented, and said that he would put the Weeks notes into the hands of David for the support of the child, and if any thing was left after bringing up the child it was to go to the child; he said that all the Weeks notes at that time amounted to $3,000 or more. Samuel at the same time enjoined it strongly upon Nathaniel to see that the child was well clothed and well taken care of, and said when he came home he should take the child himself, and take care of it and bring it up, in which case Nathaniel supposed he would take back the notes, though he said nothing in particular as to that, but Samuel said if he did not return, the Weeks notes would be in David's hands, and would go to the child. This was said a day or two before he left, and on the same day that he, Samuel, took leave of his mother. On the day that he left he told Nathaniel, that he had put the Weeks notes into the hands of David, as he had agreed, and the notes were then in David's hands, and he had told David if he could not collect money enough on the notes to pay for the support of the child, he must sell stock from his farm to pay it. Samuel left this State about the middle of March, 1842, and went to his brother, John Marston, in Charlestown, Massachusetts, where he was sick about two weeks, and then went to Cuba and never returned. Prior to his leaving this State, he put his Weeks notes, and all his other notes, into the hands of David, and gave him a general power of attorney to attend to all his business in his absence. David accepted the trust and acted as his agent, and had the possession and management of all his property, and attended to all his business in this State for him.

The Weeks notes were not indorsed by Samuel, and there was no writing giving these notes to the child, or setting them aside for the benefit of the child; and the evidence as to the purpose for which the Weeks notes were left with David, is what Samuel

told Nathaniel he would do and had done, and the conduct of the parties before and after Samuel left as herein stated, and this evidence was derived principally from the testimony of Nathaniel Marston and his wife Elizabeth, and the testimony of Nathaniel's son Jacob, who heard Samuel tell Nathaniel that he had made his will, but had made no provision for the child in his will, but the Weeks notes were for the child, and when he wanted money to call on David, and he would advance it.

The appellee objected to the declarations of Samuel, and to all evidence showing that the Weeks notes were left with the appellant in trust for the child, on the ground that the appellant had inventoried the notes as the property of Samuel, and was thereby estopped or precluded from giving any evidence to the contrary, but the auditor admitted the evidence.

After Samuel went away the appellant paid the money quarterly to Nathaniel for the support of the child, and Nathaniel paid it to Mrs. Leach until May, 1843. The appellant told Nathaniel, before they had heard of Samuel's death, that he paid the money for the support of the child out of the Weeks notes, and that the Weeks notes were left with him by Samuel, for the support of the child. These declarations of the appellant were objected to by the appellee, but were admitted by the auditor. About May, 1843, Nathaniel became blind, after which time the appellant paid Mrs. Leach for the support of the child, and continued to pay her until February 28, 1848, and expended therefor, up to that time, about $600. Nathaniel lives in a house in Greenland, formerly owned by Samuel, and by him devised to Mary, and now owned by her.

Samuel, on the day he took leave of his mother, told Mr. Weeks, the maker of the notes, that he was going away, and said he should leave the notes with the appellant in such a manner that he, Weeks, would not be troubled about them, except to pay the interest yearly, and when he came home he should take them up again. These declarations of Samuel were objected to by the appellant, but were admitted.

On the 16th day of February, 1843, the appellant caused an action to be commenced in the name of Samuel P. Marston

against Weeks upon the notes, and on the 3d day of July, 1843, Weeks paid the contents of the notes to the appellant. One note, originally for $2,500, was secured by mortgage, and at that time the balance due was $2,242.96, and the other notes against Weeks and others amounted to $425, and the appellant at the same time executed a release and discharge of the mortgage to Weeks, and assumed in the instrument to execute the same as executor of Samuel, and by virtue of the authority conferred on him by Samuel in his lifetime, constituting him his agent or attorney for the collection of his debts due him and the management of his property.

In May, 1843, the appellant told Mrs. Leach that property was left in his hands, but he did not say whether it was for the child or not. In July, 1843, he told Mrs. Leach that Samuel P. Marston was the father of the child and was dead, and that no provision was made for the child in his will, but that she must not be uneasy about her pay, as he would pay her for the support of the child from his own good will, and asked her to keep the child as cheap as she could. She had conversations with him afterwards, when he came to pay for the board of the child, at] which time he told her that she must keep the child as cheap as she could afford ; that money was hard to come at, and there was no property left for the child, or no provision made for it, and that he paid for the support of the child from his own good will. In December, 1847, the appellant requested Mrs. Leach to take back the old receipts which she had given, and to give him new ones, and she did so. The old receipts read as follows: Received of David C. Marston, —— dollars, in full for the board of the child up to that date. The new receipts read as follows: Received of David C. Marston —— dollars, in full for the support of Samuel P. Marston's child, up to that date.

For the purpose of contradicting Nathaniel and Elizabeth Marston, the appellee offered Judge Sullivan as a witness to prove what their testimony was at the hearing before him. Judge Sullivan testified, that Nathaniel and Elizabeth testified before him; that he took full minutes of their testimony at the

Marston *v.* Marston.

time for the purpose of deciding the case, and took down all that he considered material; and his belief was, that he took down the greater part, if not the whole, of their testimony, but he could not swear that he did take down the whole that they testified, and he could not now remember what their testimony was, except from his minutes. The appellant objected to his using or reading from his minutes; but the auditor allowed him to read his minutes of their testimony. According to those minutes, Nathaniel testified before Judge Sullivan, that Samuel agreed to put all his notes and money into the hands of the appellant, for the support of the child, and agreed it should remain there until he, Samuel, should come home, and that he would take the child on his return; that there was no limitation as to time that the money was to remain in the appellant's hands. He did not testify that Samuel said any thing as to what was to be done with the notes and money if he, Samuel, did not come back, nor as to what was to be done with the rest of the money, if any remained after bringing up the child. He testified that part of the agreement of Samuel was, that he was to make a will disposing of his property, and to carry out his agreement in the will, and he told him afterwards that he, Samuel, had made his will as he agreed, and that the property was given to Mary and her heirs, but the money part was to be distinct from the will, and was to be kept to be paid out to him, Nathaniel, as he wanted it. In other respects, the testimony of Nathaniel before Judge Sullivan, so far as it went, did not differ materially from his testimony before the auditor, though his testimony before the auditor was much more full than Sullivan's minutes, and contained several things not in those minutes. Nathaniel testified before the auditor, that he did not testify before Sullivan, that Samuel agreed to put all his notes into the hands of the appellant, for the support of the child, but only the Weeks notes.

According to Judge Sullivan's minutes, Elizabeth Marston testified before him that Samuel said that all his money and notes were to bring up the child, and were put into the appellant's hands for that purpose. She did not testify that Samuel said any thing as to what was be done with the rest of the money,

if any remained, after bringing up the child; but she testified that Samuel said if he did not return, the appellant would have in his hands all that he had left for the child. In other respects, the testimony of Elizabeth before Judge Sullivan, so far as it went, did not differ materially from the testimony before the auditor, though her testimony before the auditor was much more full than Sullivan's minutes, and contained several things not in those minutes. She testified before the auditor, that her testimony there was the same as before Judge Sullivan.

In the account which the appellant presented originally to the *judge of* probate for settlement, he did not charge himself with the proceeds of the Weeks notes; but the appellee appeared before the judge of probate, and moved that the appellant be charged with the proceeds of those notes and with the interest thereon; and the judge of probate decreed and ordered that he should be so charged, and entered upon the credit side of the account the following items : —

> " By notes of William Weeks, inventoried, one
> dated July 22, 1833, and paid July 3, 1843,
> and one, the date not given in the inventory,
> paid July 3d, 1843                                    $2,242.96
> Interest on same from July 3, 1843                        641.49
> By notes of William H. Weeks & al. of May 19,
> 1841, paid July 3, 1843                                   425.00
> Interest on same from July 3, 1843                        121.55
>
>                                       $3,431.00 "

The appellant then claimed to be allowed for what he had paid and expended for the support of the child up to that time, amounting to about $600; but the judge of probate allowed him only what he had paid and expended for the support of the child up to the time when he heard of Samuel's death, and entered upon the debit side of the account the following item : —

" To paid for the support of a child of Samuel P. Marston, from March 7, 1842, to June 7, 1843, five quarters,    $150."

All the rest of the appellant's claim for what he had paid and expended for the support of the child was disallowed by the judge.

Marston *v*. Marston.

The appellant also claimed $117 for his services in collecting the money and paying for the support of the child, and for his care and trouble about the child, but the judge of probate disallowed the claim.

It was from the decree of the judge of probate, charging the appellant with the proceeds of the Weeks notes and with the interest thereon, and disallowing his claim for what he had paid and expended for the support of the child and for his services in taking care of the same as before stated, that the appellant took this appeal to the Superior Court. No appeal was claimed or complaint made on account of any other part of the account, as the same was settled.

*Christie*, for the appellant.

Upon the facts as reported, the trus tmust be sustained ; or in other words, the appellant must apply to the support and education of the child so much of the Weeks notes as may be needed therefor, and account to her for, or pay over to her, the balance. This we maintain on the ground, that they were put into his hands for this purpose, under such circumstances and upon such agreement and consideration, that Samuel P. Marston, if he had directly attempted so to do, could not have revoked or reclaimed· the notes or the proceeds thereof.

The facts found, show that Samuel P. Marston had done and committed a grievous wrong and an atrocious injury to Nathaniel Marston, his infant or minor daughter, and his family,—a wrong and injury for which he was liable and bound in law to answer and make compensation, as far as it could be done in damages, to Nathaniel Marston; that, on being sent for, and charged with having done and committed such wrong and injury, " he acknowledged it and admitted it, and expressed much regret for what had happened, and said that he would do all in his power to make reparation, would always support the child, but wanted the matter kept secret, on account of the family and of his own reputation. He requested Nathaniel to find a place for the child where it could be kept secret, and told him that he was willing to do any thing about the matter that he, Nathaniel, thought he ought

to do ; and upon being asked what he was willing to do, said that he would give the child the Weeks notes for the purpose of bringing it up." Upon this, Nathaniel immediately procured a place for the child, sent it there, and the matter was kept secret. Samuel furnished money to Nathaniel for the child's expenses, and the matter remained open or not entirely adjusted, until Samuel P. informed Nathaniel that he had concluded to go to Cuba, and was going to make his will, and stated how ; whereupon, " Nathaniel asked him what he was going to do for the child ? He said he had agreed with him that the Weeks notes should go to support and bring up the child, and if any thing was left it was to go to the child, and asked Nathaniel if that would satisfy him, and Nathaniel said it would."

After this, and before Samuel P. left the country, having made his will, and made no provision therein for the child, as it was understood he should not, as that would lead to exposure, by agreement between him and Nathaniel, he put the Weeks notes into the hands and possession of the appellant for the support of the child, with power to collect the same, and if any thing was left after bringing up the child it was to go to the child. Upon this basis, arrangement, and consideration, the whole matter was compromised and settled between Samuel and Nathaniel, and soon after Samuel left the country with the knowledge of, and without objection from, Nathaniel, who had been thus compensated and satisfied for the wrong and injury by him sustained, and for the liability he had incurred and was still under for the support of the child. Now we submit, that, upon these facts, thus summarily stated, the putting said notes into the hands and possession of the appellant was the ground, basis, or consideration of an accord and satisfaction between them of the claim or right of damages of Nathaniel against Samuel P. It was an accord and satisfaction executed.

Suppose that, instead of agreeing to give the notes, and put them into the appellant's hands for the support, education, &c. of the child, and Nathaniel's agreeing to accept that in satisfaction, he had agreed to give to Nathaniel, and that Nathaniel had agreed to accept the notes and the money due thereon, in satis-

Marston *v.* Marston.

faction of his claim against Samuel P. for the wrong and injury aforesaid, and that they had actually executed this agreement, or accord and satisfaction, by delivery and reception of the notes, with power to collect the money due thereon ; would not this have been binding on the parties, or could Samuel have rescinded and avoided the contract and compromise after it was fully executed, and thus have reclaimed the notes or money due or collected thereon ; or could his administrator, in case of his decease, have done so ?   This we think will hardly be contended.

But what difference does it make in this behalf, whether the notes are given directly to Nathaniel in satisfaction of his claim, or are with and by his assent and direction put into the hands of the appellant for the sole use and benefit of the child, in whose welfare Nathaniel felt and chose to take an interest ?   In the latter case, Samuel has as much consideration for parting with his notes, namely, — the satisfaction of Nathaniel's claim against him, — as in the former, and has, consequently, no more right to reclaim the notes or money due or collected on them, than in the former case.

This is in fact a provision made for the child by Nathaniel, as it is by a surrender of his rights that this provision is purchased or secured for the child.   And this provision thus made for the child may, and will be enforced both in law and equity, as the case may require, as in other cases where money or other property is put into the hands of A. by B. for C.   C., in such case, may maintain a suit at law or in equity, as the case may require, to recover of A. the money thus intrusted to him for C., or to compel the appropriation of the money or property according to the terms and purposes of the trust or deposit.   So, in this case, the appellant is bound, both in law and equity, to appropriate the proceeds of these notes to the support, education, and use of the child, and is compellable, both in law and equity, to do it. If so, he clearly ought not to be charged for the same in his administration account. Story on Bailm. § 75 ; *Israel* v. *Douglass*, 1 H. Black. Rep. 242 ; Bac. Abr. Bailment, D. ; *Tanner* v. *Russell*, 1 Bos. & Pull. 295 ; Story's Eq. Jur. § 1041, 1044.

Again, there was a moral and natural obligation, and perhaps,

---

---

as he adopted the child, a legal obligation resting upon Samuel
P. Marston to provide for the child.

"There are cases," says Ch. Kent, 2 Com. 216, "in which
the courts of equity have regarded bastards as having strong
claims to equitable protection, and have decreed specific per-
formance of voluntary settlements made by the father in favor
of the mother." *Marchioness of Annandale* v. *Harris*, 2 P.
Wms. 432; *Horton* v. *Gibson*, 4 So. Car. Eq. Rep. 139; *Burke*
v. *Winthrop*, 1 Johns. Ch. Rep. 338.

In the case from P. Wms., Lord Ch. *King* says, "If a man
does mislead an innocent woman, it is both reason and justice
that he should make her reparation. The case is stronger in
respect to the innocent child, whom the father has occasioned to
be brought into the world in this shameful manner, and for whom
in justice he ought to provide."

On this ground, too, the father having made this provision for
the child, and never having (even if he could have done it)
*expressly* nor, we think, *impliedly* revoked it, the same is still
binding and in force. If he was under a moral or natural obliga-
tion, not to say a legal one, (which is, perhaps, the case,) to make
provision for the child, and had done it, as in this case he had,
the subsequent execution of a will, or codicil, making a gratuitous
disposition of property, and not expressly revoking the provision
for the child, should not be allowed by implication to revoke such
provision, any more than it would a *bonâ fide* disposition of any
other personal property, previously made by the testator. This
would be to allow an entirely voluntary and gratuitous provision
to uproot and extinguish a previous disposition of property made
by the testator, upon a moral or natural consideration, even with-
out an intimation, on his part, of any such purpose. We say,
then, that this provision, found to have been made for the child,
was valid and irrevocable, — 1st, on the ground that it was matter
of contract upon a good and valuable consideration, between the
testator and Nathaniel Marston; 2d, that it was in fulfilment of
a moral and natural obligation, and we think, indeed, a legal one,
as Samuel, in fact, adopted the child as his.

But the facts and circumstances detailed in the report are a

key to, and a perfect explanation and, we think, justification of, the motives that probably induced this course. It was the desire and understanding of all concerned, from the beginning, that this adjustment, and the facts out of which it grew, should be kept concealed, and this could be done in no other way.

But even if the appellant at the time he made the inventory, knowing all the facts, mistook the law, and thought that upon the facts, these notes were the property of the testator, and belonged to his estate, (and we are perhaps bound to take it so,) should, or could this honest mistake of the law, conclude his rights, and expose or subject him to the loss of the entire amount of these notes? How this was does not appear, as he has not been allowed to testify. It is certainly no new or uncommon thing for an administrator on the settlement of his administration account, to be allowed and credited the appraised value of various articles appraised, as were these notes, and which were afterwards at law, or otherwise, ascertained not to have been the property of the testator, at the time of his decease.

It does, however, appear, that after Samuel left, "appellant paid the money quarterly for the support of the child, and that he told Nathaniel, before they had heard of Samuel's death, that he paid the money for the support of the child, out of the Weeks notes, and that the Weeks notes were left with him for the support of the child;" thus showing, that they all understood that these notes were for the child.

At all events, the decree of the court below, we think is erroneous, in that it refused to allow to the appellant any thing for money paid for the support of the child, after he knew of the death of the testator. We think he should have been allowed all the sums thus expended up to the time when the questions arising upon the codicil were finally settled; but certainly up to the time when the codicil was first presented or came to his knowledge. And we also claim that all, or a large part of the $117 charge, should have been allowed to the appellant.

If our view of the facts and law of the case, be correct, and we have great confidence it is, the court below erred in not crediting, or not allowing the appellant to credit himself in his admi-

42*

nistration account, with the whole appraised value of the Weeks notes.

*Emery*, for the appellee.

The appellant was rightfully charged, in the settlement of his account as executor of Samuel P. Marston, with the amount of the Weeks notes.

These notes were put into the inventory and returned by the appellant as part of the estate of Samuel P. Marston, to be administered upon. This is a statement of the appellant under oath, that those notes were, at the time of the death of Samuel, his property. At the time Samuel left this country, he gave all his notes to the appellant, with a general power of attorney to attend to his business in his absence. The appellant commenced a suit in Samuel's name, before his death, upon the notes. In July, after the will had been proved, and the appellant had taken upon himself the trust of executor, Weeks paid the amount of the notes to the appellant, who discharged the mortgage given to secure the same, by virtue of his authority as executor, and of the general power of attorney given by Samuel to him. After this the appellant told Mrs. Leach that there was no property left for the child, and no provision made for it.

All sums stated by an executor in his inventory given in the Ecclesiastical Court as supposed to be recoverable, are assets in his hands, unless he proves a demand and refusal. *Young* v. *Cawdry*, 8 Taunt. 834; *Shelley's Case*, 1 Salk. Rep. 296; Ram. on Assets, &c. 547, 548, and 145, 146; 2 Stark. Ev. 447, 448.

In addition to the inventory, it is in evidence that the Weeks notes have been paid to the appellant as executor of S. P. Marston. Whatever money is received by an executor, in that capacity, whether rightfully or otherwise, he must account for as executor, unless he shows a liability to pay it over to some person having a right to it, and that payment has been demanded, or, at least, that it probably will be demanded. *Jennison* v. *Hapgood*, 10 Pick. 79.

The Weeks notes have not only been inventoried, but they have been paid to, and received by, the appellant as executor.

Has he shown or can he show that any person is legally entitled to the amount, and has demanded it ?   We say not, for the reason that the child named in the auditor's report, as the child of Samuel P. Marston, is now dead.   She died since the auditor made his report, and we offer the affidavit of Thomas Marston, furnished the court at July term, 1850, showing the death, and ask that the same be received as evidence of that fact, as there is no other way that we can bring to the court a knowledge of the same.

Samuel P. Marston never parted with his control over the personal property in controversy but by his final will, never intended to do so, and never was understood to have done so by any of the parties or witnesses in this case.

In the first place, the execution of the codicil was contested at every step from April, 1844, to December, 1847, when its existence was of no importance, if there was no property on which it could operate.

Again, the appellant inserted the same notes in the inventory of Samuel P. Marston's estate, and swore to it, as early as June 19, 1843, knowing all then that he now knows about the property, and never intimated it was not the property of the estate, until January, 1848.

Again, the notes were negotiable, but not indorsed by Samuel P. Marston, secured by a mortgage which was not assigned, a suit was commenced before the death of Samuel P. Marston by the appellant, in the name of S. P. Marston, and afterwards discharged by David as executor, and by the authority he had by a general power of attorney generally to manage the business of Samuel, in his absence.

Again, long after the death of Samuel P. Marston, the appellant told Mrs. Leach that no property was left for the child, and no provision made for it, and he must pay of his own good-will.

Again, in May, 1848, Nathaniel Marston testified before the judge of probate, " that Samuel agreed to put *all his notes and money* into the hands of the appellant for the support of the child, and agreed it should *remain there until he, Samuel, should come home, and that he would take the child on his return.*"   At the

hearing before the judge of probate, in May, 1848, it appears from the testimony of the executor of Samuel P. Marston, the appellant, and by the testimony of Nathaniel and his wife, that Samuel had a power to reclaim the notes or fund at any period after he had deposited them. Nathaniel, in his testimony before the judge of probate, said Samuel agreed to deposit all his notes and money; in his testimony before the auditor, he spoke only of the Weeks notes. Both Nathaniel and his wife swore differently before the auditor from what they did before Judge Sullivan, in several particulars, and are directly contradicted by Judge Sullivan's testimony. It was not until Judge Sullivan had given the reasons for his decision, in his letter of April 19, 1848, that N. Marston and his wife contrived to shape their testimony to give a color that Samuel P. Marston had made an absolute conveyance of the property to the use of the child.

We consider it much more reasonable to rely upon the first edition of their testimony, with the circumstances attending it, than that which was revised and altered to meet and answer certain positions of law.

The argument for the appellant, founded upon the assumption of accord and satisfaction with Nathaniel Marston, or any legal consideration in him, is not sustained by any fact stated in the case. The case does not find that Mary P. Marston was a minor, or that Samuel P. Marston seduced her, more than she seduced him. It does not appear that Nathaniel ever set up that he had any claim on Samuel; indeed, he had none, because Mary was not living with him at the time, nor his servant, nor under his care and control. *Miller* v. *Thompson*, 1 Wend. 447, and the cases there cited. And he never made any release, verbal or written, of any claim upon said Samuel. There was no consideration moving from Nathaniel to Samuel, upon which to found any agreement.

If the last edition of the appellant's testimony is to be taken to be literally true, it proves no such assignment, or legal disposition of the property, as to exempt or exclude it from the operation of the will and codicil.

Where a trust is actually created, and the relation of trustee

and *cestui que trust* established, a court of equity will, in favor of a volunteer, enforce the execution of the trust, against the person creating the trust, and all subsequent volunteers; although it will *not create a trust, or establish the relationship of trustee and* cestui que trust, *by enforcing the performance of an agreement, or by giving effect to an imperfect conveyance or assignment in favor of volunteers.* *Ellison* v. *Ellison,* 6 Ves. Jr. Rep. 666.

In this case the conveyance of the notes and mortgage was imperfect, the notes not being indorsed or the mortgage assigned; even equity would not enforce the same. The proceedings are at law, and must be governed by the rules of law. David C. Marston never accepted the trust or acted as trustee, or set up the trusts, but in fact repudiated them. The application of the appellant in this case is equivalent to asking the court, as a court of equity, to establish the relation of trustee and *cestui que trust* where it does not exist.

It is clear that a person not intending to give or part with the dominion over his property, may retain such dominion, notwithstanding he may have vested the property in trustees, and declared a trust in favor of third persons. In such cases, the trusts cannot be enforced, even in chancery. *Hughes* v. *Stubbs,* 1 Hare's Rep. 476; *Gaskell* v. *Gaskell,* 2 Y. & J. Rep. 502. These are cases in point, and apply directly to the case under consideration, because Samuel never gave the property to David as trustee. He gave him a general power of attorney to act for him, at the same time he delivered the papers to him. David was the agent of Samuel, and consequently Samuel never parted with the dominion of his property. The two cases above named are stronger on this point than the case at bar.

Where a person has ineffectually attempted, by an imperfect gift, to confer the whole interest upon volunteers or trustees for their benefit, equity will not interfere; for it has been repeatedly determined that the most clear *intention* to confer an interest, will not be sufficient to create a trust in favor of a volunteer. *Antrobus* v. *Smith,* 12 Ves. Jr. Rep. 39. In *Edwards* v. *Jones,* 1 My. & Cr. 226, the obligee of a bond signed a memorandum

not under seal, which was indorsed upon the bond, and which purported to be an assignment of the bond, without consideration, *to the person to whom the bond was at the same time delivered.* Lord *Cottenham,* upon the authority of *Antrobus* v. *Smith,* held that the gift was incomplete, and that as it was without consideration, the court could not give effect to it. *Dillon* v. *Coppin,* 4 My. & Cr. Rep. 647; *Searle* v. *Law,* 15 Sim. Rep. 95; *Halloway* v. *Headington,* 8 Sim. Rep. 321; *Beatson* v. *Beatson,* 13 Sim. Rep. 281; *Ward* v. *Audland,* 8 Sim. Rep. 871; S. C., 8 Beav. Rep. 291. In this last case it was holden, that the mere voluntary assignment of a *chose in action* is not binding, on the ground that nothing thereby passes at law, and the transaction is therefore incomplete.

Another rule supported by a large class of cases, bears strongly upon this point: That courts of equity will not carry into effect a mere voluntary agreement, contract, or covenant, to transfer property. *Cotteen'* v. *Missing,* 1 Madd. Rep. 176; *Colyear* v. *Mulgrave,* 2 Kean's Rep. 81; *Jeffreys* v. *Jeffreys,* 1 Cr. & Ph. Rep. 138; *Cuningham* v. *Plunkett,* 2 Y. & C., V. C. 245.

A merely meritorious consideration as a provision for wife and children after marriage, will not be sufficient inducement to a court of equity to lend its aid in enforcing a voluntary agreement or covenant, or the giving effect to an imperfect gift. *Ellis* v. *Nimmo,* Lloyd & Goold's Rep. 333; *Halloway* v. *Headington,* 8 Sim. Rep. 324; *Dillon* v. *Coppin,* 4 Myl. & Cr. 646, 671; *Jeffreys* v. *Jeffreys,* 1 Cr. & Phil. 138, 141.

In this country it is considered as the prevailing doctrine, that a provision for a wife or child is a sufficient meritorious consideration to lead to the enforcement of an executory agreement or trust, at least where the instrument is under seal. *McIntire* v. *Hughes,* 4 Bibb's Rep. 186; *Dennison* v. *Goehring,* 7 Barr's Rep. 175, 179.

But this principle reaches only to the case of wife and child. It does not extend to any collateral kin, nor probably to any descendant more remote than a child. *Buford's heirs* v. *McKee,* 1 Dana's Rep. 107; *Hayes* v. *Kershow,* 1 Sandf. Rep. 258.

And it reaches only to cases where the agreement is under

seal, which imports a consideration, and renders it valid at law. *Caldwell* v. *Williams*, 1 Bailey's Eq. Rep. 175, 176.

Bastard children are considered as volunteers. Equity will not supply the want of a surrender, in behalf of a natural child. *Fursaker* v. *Robinson*, Pre. Ch. 475 ; Gilb. Eq. Rep. 139.

The whole fabric upon which the appellant rests his case is, the *verbal admissions* of Samuel. They ought to be received with great caution. It is the mere repetition of oral statements, and subject to much imperfection and mistake. It was a subject that Samuel did not like to talk upon. He probably did not more than half express himself, did not clearly express his meaning. Nathaniel did not clearly and fully understand him. Nathaniel may have and probably has, considering the different statements he has made, altered intentionally or unintentionally a few of the expressions used by Samuel, and given an effect to a statement, completely at variance with what Samuel actually did say. 1 Greenl. Ev. Sec. 200, page 254, and authorities cited in note 2.

The evidence of Judge Sullivan was properly admitted. *Clark* v. *Vorce*, 15 Wend. 193 ; *Hayes* v. *Wendell*, 11 N. H. Rep. 118 ; 1 Greenl. Ev. § 437, page 544, (*n*) 4.

GILCHRIST, C. J. The evidence shows, that Samuel P. Marston, being the father of an illegitimate child by his niece, made a verbal agreement with his brother Nathaniel, that he would appropiate the amount due on certain notes, which he held against one William Weeks for about three thousand dollars, for the support and bringing up of the child. The notes were accordingly deposited with the appellant, and he expended the sum of six hundred dollars for the support of the child. The child died on the tenth day of November, 1849.

The appellant's case is, that after the child should have been supported and brought up, if any part of the fund remained, it was to go to the child ; that during the life of the child, the appellant held the fund upon a specific trust, which, at the time of the rendition of his account had not been fulfilled, and that the trust was not revoked by the will or subsequent contract of the testator.

There is evidence in the case tending to prove, that after the birth of the child, Samuel the father, said to Nathaniel, that he would give to the child the Weeks notes for the purpose of bringing it up, and if any thing was left it was to go to the child. He also said, that when he returned from Cuba he should take the child himself and take care of it and bring it up, in which case Nathaniel supposed he would take back the notes, though he said nothing in particular as to that, but said if he did not return, the Weeks notes would be in David's hands, and would go to the child. The Weeks notes were not indorsed by Samuel, and there was no writing giving them to the child or setting them apart for its benefit.

The above facts are stated by Nathaniel Marston and his wife. Now, without inquiring into the questions raised by the admission of Judge Sullivan to testify under the circumstances detailed in the case, and to the contradictions of their testimony stated in his minutes, there is evidence that in the month of July, 1843, the appellant told Mrs. Leach that no provision was made for the child in the will, and that he would pay for its support from his own good will, and that he afterwards told her there was no property left for the child, and no provision made for it, and that he paid for its support from his own good will. What may have been his motive for making these statements, it is unnecessary to inquire. Within three or four weeks after the birth of this illegitimate child he married its mother, without any previous declaration of his intentions to her parents. Perhaps he supposed that by the marriage the fund in question would become his own property, and perhaps his object was to make the best bargain he could with Mrs. Leach for the child's support. But whatever his purpose may have been, it can be doing him no injustice to weigh his own statements upon the matter of fact against the evidence of his own witnesses, and to consider them in connection with the story told by Mr. and Mrs. Nathaniel Marston. Tried, then, by this test, the evidence falls short of proving such a trust as the appellant alleges to exist; that is, that the fund, after deducting from it the expense of supporting the child, should become its property.

Marston *v.* Marston.

There are also other objections, appearing on the case, to the alleged trust.   There is nothing, however, to show that Samuel Marston might at any time, at his pleasure have revoked the deposit he had made with the executor, and have countermanded his authority, although the case contains an intimation tending to show an agency merely on the part of the executor; for before he went to Cuba, he said that on his return he should take the child himself, and take care of it, and bring it up.   But it does not appear how long the "bringing up" of the child was to continue; how much education it was to receive, if any beyond an ordinary school education, and at what time it was to be entitled to the principal of the fund.   The evidence does not prove anything more than that the fund was deposited with the executor for the supporting of the child, and that after it should have been brought up, the remainder of the fund, if any, should belong to the child.   But at the age of seven or eight years, the child could not be said to have been *brought up*, in the sense in which those words were probably used by its father.   There is nothing in the case which shows that this was intended as an unconditional gift to the child in consideration of the paternity of the donor, so that its heirs at law should benefit by it.   Although the trust was unfulfilled at the time the appeal was taken, the death of the child in the subsequent year was a determination of it, and after that period the executor held the fund as a part of the general assets of the testator.   We think, therefore, that so much of the decree as charges the executor with the amount due on the Weeks notes, should be affirmed.

No question of consideration arises in the case.   The deceased did not make an executory contract for the support of the child. The transaction was a gift to the executor of property, to be held by him in trust, and so much of it as was necessary appropriated for the child's support.   The delivery was necessary, and without it the property would not have passed.   *Irons* v. *Smallpiece*, 2 B. & A. 551; *Cook* v. *Husted*, 12 Johns. 188; *Fink* v. *Cox*, 18 Johns. 145.   And from the same authorities it appears that a gift accompanied by delivery will pass the property.   *Bean* v. *Jones*, 8 N. H. Rep. 149.   In the case of *Smith* v. *Smith*, 7 C.

& P. 401, it was held, that if a father make to a son under age an absolute gift of a chattel, and deliver it, he cannot afterwards without the son's consent, reclaim the gift. In the present case, as the property passed by the delivery, the gift cannot be reclaimed by the subsequent execution of the will. ·

We think that the judge of probate erred in disallowing the claim made by the executor for the sums paid by him for the support of the child, and for his services in collecting and expending the money. ; The sums paid by him should be credited to him, and he should be allowed a reasonable sum for his services. The decree should be affirmed as to all the other matters specified in the appeal, and the case is remitted to the probate court for further proceedings, according to the principles above stated.

Costs are to be taxed for the executor. Upon the rendition of his account he claimed no interest in the fund except as a trustee. The questions in the case were sufficiently important to the parties interested, to authorize this appeal, and in the position he occupied it would be inequitable to charge him personally with the costs.